❏ Original     ❏ Dup



CLERK'S OFFICE
A TRUE COPY
Jun 14, 2023
SMDH
Deputy Clerk U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

## for the

### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| The person and celluar phone of Charles T. Lawrence (DOB: xx/xx/1974), as more fully decribed in Attachment A. | ) ) ) ) |

Case No. **23-M-389 (SCD)**

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before     6-28-23     *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.     ❏ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to     Honorable Stephen C. Dries     .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❏ for _____ days *(not to exceed 30)*     ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:     6-14-23     12:35 pm

*Judge's signature*

City and state:     Milwaukee, WI

Honorable Stephen C .Dries, U.S. Magistrate Judge
*Printed name and title*

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**<u>ATTACHMENT A</u>**
*Person and Property to Be Searched*

The person of CHARLES LAWRENCE (DOB: XX/XX/1974), and any cellular phone on his person.

**ATTACHMENT B**
*Particular Things to be Seized*

1.      All records, information, and items related to violations of 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1957 (money laundering), and 18 U.S.C. § 1956 (money laundering) including:

    a. Evidence of communications regarding Landes Trust, Landes Prive LLC, Landes & Cie Trust Prive, and any other Landes-related entities;

    b. Evidence of communications offering, soliciting, or discussing investment opportunities;

    c. Evidence related to financial transactions utilizing funds provided by third parties;

    d. Email communications utilizing the email address cl@landestrust.se;

    e. For computers, cellphones, and electronics capable of communication or storage (collectively, "computers"):

        i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

        ii. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

        iii. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

        iv. evidence of the attachment to the computer of other storage devices or similar containers for electronic evidence;

        v. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer;

        vi. evidence of the times the computer was used;

vii. passwords, encryption keys, and other access devices that may be necessary to access the computer;

viii. documentation and manuals that may be necessary to access the computer or to conduct a forensic examination of the computer;

ix. records of or information about Internet Protocol addresses used by the computer;

x. records of or information about the computer's internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any internet search engine, and records of user-typed web addresses;

xi. contextual information necessary to understand the evidence described in this attachment;

xii. lists of contacts and any identifying information.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage and any photographic form.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

During the execution of the search described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of CHARLES LAWRENCE to the fingerprint scanner of the device; (2) hold a device found in front of the face of CHARLES LAWRENCE and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

19



**CLERK'S OFFICE**
**A TRUE COPY**
Jun 14, 2023
s/JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

<table>
<tr><td>In the Matter of the Search of<br><i>(Briefly describe the property to be searched<br>or identify the person by name and address)</i><br><br>The person and cellular phone of  Charles T.<br>Lawrence (DOB xx/xx/1974), as more fully described<br>in Attachment A.</td><td>)<br>)<br>)<br>)<br>)<br>)</td><td>Case No.  <span style="color:blue">23-M-389 (SCD)</span></td></tr>
</table>

### APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

❏ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343, 18.U.S.C.<br>§§ 1956(a)(1)(A) and 1957 | Wire fraud and money laundering |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

❏ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Sara Hager, SA - FDIC - OIG
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
telephone _____ *(specify reliable electronic means).*

Date:  6-14-23

_____
*Judge's signature*

City and state:  Milwaukee, WI

Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

I, Sara Hager, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search of a person, and the extraction of evidence from that person as described in Attachment B.

2.      1.      I am a Special Agent (SA) with the Federal Deposit Insurance Corporation – Office of Inspector General (FDIC-OIG), and have been so employed since April 2014. I am also assigned as a Task Force Officer on the White Collar Squad of the FBI Milwaukee Field Office. My duties as a Special Agent include investigating violations of federal law, including various white-collar crimes such as wire fraud, money laundering, mortgage fraud, bank fraud, and I have received training regarding numerous investigations of white-collar crimes.

3.      I am currently participating in an investigation of Charles LAWRENCE related to his offering an "investment" into LANDES PRIVE LLC. Based on the investigation to date, LAWRENCE's investment offering is fraudulent, and the money he obtains from victims is spent on LAWRENCE's personal expenses, Ponzi payments to prior victims, and payments to third parties assisting LAWRENCE with the scheme. LAWRENCE was indicted by a Grand Jury sitting in the Eastern District of Wisconsin on May 16, 2023. The Indictment charged LAWRENCE with one count of wire fraud, in violation of 18 U.S.C. § 1343, and three counts of money laundering, in violation of 18

U.S.C. §§ 1956(a)(1)(A) and 1957. Based on my investigation to date, there is probable cause that LAWRENCE's crimes involved third-party co-conspirators who have not been charged.

4.     Further, there is probable cause to search the locations described in Attachment A for evidence of these crimes, as described in Attachment B.

## PERSON AND PROPERTY TO BE SEARCHED

5.     The person of CHARLES LAWRENCE (DOB: XX/XX/1974),

6.     Any cellular phone on LAWRENCE'S person.

## PROBABLE CAUSE

7.     On March 17, 2020, Charles LAWRENCE opened an account at Bank of America, ending in 6307, in the name of Landes Prive LLC (the "Landes Account"). He was the sole signatory.

8.     There was little activity in the account until 2022 when the account began to receive larger and more frequent deposits from a variety of sources. Between January 2022 and March 2023, the Landes Account received incoming wire transfers totaling nearly $5 million.

9.     The Securities and Exchange Commission was ultimately alerted to this activity by individuals who claimed to be investors who said they were induced to wire money into the Landes Account by Charles LAWRENCE.

10.     A review of the investment offerings LAWRENCE sent investors revealed a variety of promises LAWRENCE made with respect to investments sent to him, including that:

2

- "All funds will be in the clients Landes account and visible at all times"

- "Principal Investment will be blocked and will not be at any risk and it will be released [in x# weeks] from the date the funds are blocked. If the trade is unsuccessful and there are losses, the client's Principal funds are never depleted and there will be no delay in releasing the client's principal funds after the [x#] weeks."[1]

- "Historical and anticipated profits of [various percentages] weekly are possible and likely"[2]

11. Investors who were interviewed indicated that they relied on these written representations as well as statements made by LAWRENCE via telephone, text message, and WhatsApp communications. During those conversations, LAWRENCE told investors that their funds would not be at risk because they were to be used as collateral. LAWRENCE also told investors that they would be able to see their funds through use of a Landes Bank portal, which website LAWRENCE provided.

12. For example, victim W.H. signed an investment agreement containing the statements listed above. W.H. told investigators that, based on those representations, W.H. wired $500,000 to the Landes Account on June 10, 2022. W.H. also told investigators that LAWRENCE provided W.H. with a link to a portal through which W.H. could purportedly see his "investment." LAWRENCE also communicated with

---

[1] The contracts varied in terms of the number of weeks during which the "investment" would be active.
[2] The contracts varied in terms of the percentage of profit that was reasonably expected.

3

W.H. via email and WhatsApp, and provided W.H. updates about the amount of money W.H. had earned through the investment.

13.     In reality, W.H. had wired his $500,000 to the Landes Account. Based on a review of the bank statements, and their training and experience, agents do not believe that W.H.'s money was used as collateral or invested. Instead, agents believe that LAWRENCE spent the money on personal expenses, including $4,426.13 at Louis Vuitton and $6,042.74 at Tom Ford, which bank records show LAWRENCE spent on the same day W.H. wired the funds to the LANDES Account. According to bank records, three days later, LAWRENCE wired $150,000 to Steven Richman. W.H. told agents that Richman works with LAWRENCE and serves in the role of "vetting" investors. W.H. told agents that he never gave permission to LAWRENCE to provide any of his principal to Richman nor to spend it on personal expenses.

14.     Similarly, on August 18, 2022, bank records show that CDEA wired $225,000 to the Landes Account. According to representatives of CDEA, the genesis of this wire was another investor who was provided a similar "contract" to that provided to W.H. and who wired money to the Landes Account based on LAWRENCE's fraudulent promises. Based on a review of the bank records, and their training and experience, agents believe that by September 27, 2022, LAWRENCE had spent the entirety of CDEA's and W.H.'s money on personal expenses. Bank records show that by September 27, 2022, only $129,798.95 remained in the Landes Account. Based on a review of the bank records, and their training and experience, agents do not believe that any money from the Landes Account was invested. Agents also do not believe that any of the

4

money wired into the Landes Account was utilized as collateral for foreign-bank investing.

15.    On September 27, 2022, B.H. wired $500,000 to the Landes Account. B.H. told investigations he made this transfer because of representations made by LAWRENCE and the contract LAWRENCE sent him, which contained the same language as quoted above.

16.    A review of the bank records shows that the day after B.H. wired $500,000 for purposes of investment, LAWRENCE wired $50,000 to Richman, and $400,000 to Starplan Investments. Based on their training and experience, and the investigation to date, agents believe that Starplan Investments had previously "invested" money with LAWRENCE based on similar false representations that they would be able to earn significant returns and that their principal would not be at risk. Based on a review of records and interviews, and their training and experience, agents believe that the $400,000 wire of B.H.'s money to Starplan was a Ponzi-payment intended to further LAWRENCE's fraudulent scheme.

17.    Based on a review of records and interviews, and their training and experience, agents believe that between January 2022 to March 2023, Lawrence solicited at least 11 investors and raised approximately $5 million.

18.    Lawrence sent these investor-victims contracts titled "Agreement for Financial Trade" by and between Landes & Compagnie Trust Prive KB (known as "Landes") and the investor. Those contracts articulated the investment terms and guarantees, including the language quoted above.

5

19.	Contrary to LAWRENCE's claim that investor funds would be held in a locked account and not used for any purposes, Lawrence directed investors to wire their investments to the Landes Account.

20.	A review of the Landes Account demonstrates that the funds deposited there were used for personal expenditure such as chartered private jets, luxury jewelry and a vehicle purchase, investor Ponzi payments and day-to-day living expenses.

*Lawrence's Use of a phone to Effectuate the Scheme*

21.	LAWRENCE has routinely utilized his cellular phone, which during the course of this investigation has had the phone number 347-324-7968, for more than the past year, to communicate with his victims and third parties to whom he made payments with victim funds.

22.	For example, victim J.Z. noted in an email communication to LAWRENCE on February 9, 2022, that he had left LAWRENCE a voicemail. On August 17, 2022, J.Z. asked LAWRENCE who he could call to confirm wire instructions. LAWRENCE responded using the email account, cl@landestrust.se, with phone number 347-324-7968.

23.	B.H. also indicated that he communicated with LAWRENCE using phone number 347-324-7968. He indicated that he communicated with LAWRENCE via text message and WhatsApp communications. When he was interviewed as recently as May 2, 2023, B.H. indicated he was still in contact with LAWRENCE at that number.

24.     W.H. also told investigators that he communicated with LAWRENCE as well as Steven Richman utilizing WhatsApp. W.H. provided LAWRENCE phone number, as used in those communications, as 347-324-7968.

25.     Another individual, L.W., who introduced LAWRENCE to W.H., provided text message communications between himself, Richman, and W.H. Those messages included multiple references by Richman to his conversation with LAWRENCE regarding W.H.'s "investment." As late as May 4, 2023, Richman forwarded communications purportedly sent to him via message by LAWRENCE.

26.     Group chat messages including LAWRENCE, Richman, W.H. and B.H. included communications from LAWRENCE as recently as May 4, 2023.

27.     As the fraud scheme progressed and victims were unable to have their funds returned to them, Lawrence would send messages with reasons for the delay and promises of when their funds would be sent.

28.     For example, Lawrence sent  WhatsApp messages to victim W.H., B.H, Steven Richman, and L.W., who is W.H's accountant, explaining why W.H. and B.H had not received their funds as requested:

> [5/1/23, 9:48:30 AM] Charles Lawrence Landes: As we have had many issues of late after a recent upgrade. We have taken the time to ensure all issues are resolved. We are testing the system and it's redundancy.
> [5/1/23, 9:49:02 AM] L.W.: Thank you for the update.
> [5/3/23, 12:39:35 PM] B.H.: Charles, are we still on track to be fully funded / allocated tomorrow as per your last statement??
> [5/3/23, 3:46:47 PM] Charles Lawrence Landes: I've heard nothing to the

contrary

[5/3/23, 4:12:24 PM] Steven Richman: Can you contact [W.H] about his account as he had difficulty wiring funds out to his JPM account.

[5/3/23, 4:57:56 PM] Charles Lawrence Landes: We have someone looking

[5/3/23, 8:46:45 PM] W.H.: My wire transfer was canceled

[5/4/23, 9:10:04 AM] Steven Richman: Please update [W.H.] on his wire transfer from yesterday and the timing of the allocation today.

[5/4/23, 9:31:33 AM] Charles Lawrence Landes: I will be updating on timing asap today. It will be later today but I don't have exact times

[5/4/23, 1:14:25 PM] Steven Richman: It's 1:15 est, is there any update on timing.

[5/4/23, 5:33:31 PM] Charles Lawrence Landes: There will be allocations tonight and the balance tomorrow mid day ish. Once full allocation is in it will be available.

29.     On June 13, 2023, LAWRENCE appeared telephonically with the Probation department for the purpose of conducting a bond study. LAWRENCE provided his phone number as (347) 324-7968.

30.     Based on my training and experience, I know that WhatsApp is a communication service that operates via an application that is downloaded onto a phone.

31.     Based on my training and experience, individuals frequently use their cellular phones to send and receive emails.

32.     In sum, based on my training and experience, a search of a phone in the possession of LAWRENCE is likely to result in finding evidence of the crimes discussed above, including evidence of additional victims and co-conspirators involved in these criminal activities.

8

## COMPUTERS, CELLPHONES, ELECTRONIC STORAGE, FORENSIC ANALYSIS

33.     As described above and in Attachment B, this application seeks permission to search for evidence that might be found on the person of CHARLES LAWRENCE, or on his electronic devices, including a cellular phone, that might be found on the person of CHARLES LAWRENCE. Thus, the warrant for which I am applying would authorize the seizure of a cellphone or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

34.     *Probable cause.*  I submit that if a cellphone is found on the person of LAWRENCE, there is probable cause to believe records sought by this warrant will be stored on that cellphone, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this

9

evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

    d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

    35.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronic files that might serve as direct evidence of the crimes described on the warrant, but also forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on the cellphone recovered from LAWRENCE's person because:

    a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

    b.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence

10

or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual

11

information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

36.    *Necessity of seizing or copying entire electronic device.* In most cases, a thorough search of a target location for information that might be stored on electronic storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from a target location, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.    The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.    Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes

12

requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

37. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which I am applying would permit seizing, imaging, or otherwise copying electronic storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## BIOMETRIC UNLOCK

38. The warrant I am applying for would permit law enforcement to obtain from CHARLES LAWRENCE the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

39. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to

unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

40.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

41.     If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

42.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient

way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

43. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

44. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

45.     Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of CHARLES LAWRENCE to the fingerprint scanner of the device; (2) hold the device in front of the face of CHARLES LAWRENCE and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## CONCLUSION

46.     I respectfully request a search warrant to be authorized for the search of the person of CHARLES LAWRENCE, described in Attachment A, to recover and seize evidence described in Attachment B, in any form, including on any cellular phone found on his person.

16

## ATTACHMENT A
### *Person and Property to Be Searched*

The person of CHARLES LAWRENCE (DOB: XX/XX/1974), and any cellular phone on his person.

1. All records, information, and items related to violations of 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1957 (money laundering), and 18 U.S.C. § 1956 (money laundering) including:

    a. Evidence of communications regarding Landes Trust, Landes Prive LLC, Landes & Cie Trust Prive, and any other Landes-related entities;

    b. Evidence of communications offering, soliciting, or discussing investment opportunities;

    c. Evidence related to financial transactions utilizing funds provided by third parties;

    d. Email communications utilizing the email address cl@landestrust.se;

    e. For computers, cellphones, and electronics capable of communication or storage (collectively, "computers"):

        i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

        ii. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

        iii. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

        iv. evidence of the attachment to the computer of other storage devices or similar containers for electronic evidence;

        v. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer;

        vi. evidence of the times the computer was used;

      vii.  passwords, encryption keys, and other access devices that may be necessary to access the computer;

     viii.  documentation and manuals that may be necessary to access the computer or to conduct a forensic examination of the computer;

      ix.  records of or information about Internet Protocol addresses used by the computer;

       x.  records of or information about the computer's internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any internet search engine, and records of user-typed web addresses;

      xi.  contextual information necessary to understand the evidence described in this attachment;

     xii.  lists of contacts and any identifying information.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage and any photographic form.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

During the execution of the search described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of CHARLES LAWRENCE to the fingerprint scanner of the device; (2) hold a device found in front of the face of CHARLES LAWRENCE and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

19